UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CECIL O. HARVEY,

        Plaintiff

        - against -

CITY OF NEW YORK; WARDEN JOHN DOE,
Rikers Island; DEPUTY WARDEN JOHN DOE,
Otis Bantum Correctional Center; MOVEMENT
CAPTAIN JOHN DOE, Otis Bantum Correctional
Center; DEPUTY WARDEN JOHN DOE,
North Infirmary Command West Facility;
MOVEMENT CAPTAIN JOHN DOE, North
Infirmary Command West Facility; DEPUTY
WARDEN JOHN DOE, George Motchan Detention
Center; MOVEMENT CAPTAIN JOHN DOE,
George Motchan Detention Center,

        Defendants.

------------------------------------------------------------X

**THIRD AMENDED COMPLAINT**

07 Civ. 0343 (NG)(LB)

**JURY TRIAL DEMANDED**

PRELIMINARY STATEMENT

1. This is an action seeking damages to vindicate the rights of Plaintiff Cecil Harvey. Defendants New York City and its employees at the Department of Correction illegally and unconstitutionally imprisoned Plaintiff Cecil Harvey for a total of more than 140 days. Defendants also illegally prevented Mr. Harvey from accessing the courts to defend himself in his criminal case, creating consequences radically disproportionate to the minor offense with which he was charged.

2. Mr. Harvey's case exemplifies the disastrous consequences of New York City Department of Correction (NYC DOC) policy upon immigrants who are swept into the

    immigration detainer system at Rikers Island.  NYC DOC works closely with U.S. Immigration and Customs Enforcement to identify potentially deportable immigrants and to allow ICE to assume custody of such immigrants when they become eligible for release.  Although federal regulations place clear limits on NYC DOC's authority to detain immigrants for ICE, it is NYC DOC policy to hold immigrants until ICE sees fit to take them, without regard for the length of detention or the constitutional rights to liberty and access to courts of those it detains.

3.    Mr. Harvey was brought to Rikers in 2003 as a pre-trial detainee and lawful permanent resident awaiting his day in court for an alleged misdemeanor offense.  After the criminal court ordered him released, NYC DOC continued to hold him far beyond the 48 hours authorized under his ICE detainer.  He was illegally imprisoned at Rikers for 35 days.  Then, without explanation, on the morning of his scheduled criminal court date and despite his protests, NYC DOC abruptly transferred Mr. Harvey to ICE.  Unbeknownst to Mr. Harvey, when he failed to appear in criminal court that day, a warrant was issued for his arrest.

4.    Mr. Harvey spent more than two years in ICE detention.  Upon his release in March 2006, he set about rebuilding his life.  He started his own business, pursued higher education, became active in his church, and tried to make up for the time he spent away from his wife, daughters, and young grandsons.  Just as his life was getting on track, however, he was rearrested on the warrant issued by the criminal court two-and-a-half years earlier.  As a direct result of NYC DOC's illegal actions and policies, he was imprisoned at Rikers for over 100 days, prevented from arguing his immigration case in the Second Circuit, physically injured, forced to abandon his growing business, and

      deprived of precious time with his wife, daughters, and grandsons.  Moreover, as a result of this second illegal and unnecessary detention, Mr. Harvey was returned to immigration detention and held in Alabama, far from his home and family, for the remainder of his time in the U.S.

5. This action arises under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and under federal law, specifically, 42 U.S.C. §§1983 and Federal Regulation 8 CFR 287.7(d).  Like many other immigrants held at Rikers, Mr. Harvey is the victim of Defendants' unconstitutional and unlawful policies and actions.  Mr. Harvey is now before the court seeking damages for his injuries and formal recognition of the violations of his rights by the City of New York and Department of Correction employees.

## JURISDICTION

6. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

## VENUE

7. Venue is proper pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to this action occurred within this district, Plaintiff was located within the district at the time the events occurred, and Defendants may be found in this district.

PARTIES

**Plaintiff**

8. Plaintiff Cecil Harvey is a native of Barbados and at material times was a legal permanent resident of the United States.

9. Mr. Harvey immigrated to the United States from Barbados on March 4, 1972, just before his sixteenth birthday. Mr. Harvey entered the United States legally, as a lawful permanent resident. He lived in the United States as a lawful permanent resident for approximately 36 years.

10. In the course of those 36 years, Mr. Harvey married, raised a family, and built his life in the United States. Mr. Harvey's mother, Eleanor Yearwood, and his stepfather, Cleveland Yearwood, are also lawful permanent residents of the United States.

11. Mr. Harvey's wife, Wendy Harvey, is a naturalized U.S. citizen.  Mr. Harvey has three adult daughters and three young grandsons, all of whom are native-born U.S. citizens and have lived all of their lives in the United States.

12. Prior to October 2007, Mr. Harvey resided in New York City with his family.

**Defendants**

13. The Defendant Wardens and Movement Captains are employed at Rikers Island Correctional Facility.

14. At all times material to the allegations in this Complaint, Defendant Wardens and Movement Captains were acting in their official capacities as Wardens and Movement Captains employed by the City of New York, and were acting under color of state law.

15. Defendant City of New York is a Municipal Corporation, organized under the laws of the State of New York.

16. Defendant City of New York is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby.

STATEMENT OF FACTS

**I. NYC DOC Collaborates with ICE to Detain and Transfer Custody of Immigrant Inmates**

17. On information and belief, at all times material to the allegations set forth in this Complaint, New York City Department of Correction (NYC DOC) collaborated with ICE to identify potentially deportable immigrants and facilitate their transfer to ICE custody.

18. On information and belief, at all times material to the allegations set forth in this Complaint, NYC DOC received funds from the federal government for the detention of potentially deportable immigrants.

19. On information and belief, in order to receive funds from the federal government, NYC DOC is required to identify foreign-born inmates and report the number of days each is held in NYC DOC custody.

20. On information and belief, it is New York City policy to detain potentially deportable immigrants until ICE is able and willing to assume custody.

**II. New York City Unlawfully Imprisoned Plaintiff for 35 Days Between December 9, 2003, and January 13, 2004**

21. Mr. Harvey was taken into the custody of the New York City Department of Correction on December 2, 2003, pursuant to a warrant for an alleged misdemeanor offense.

5

22. On the same day, Mr. Harvey was brought before the Misdemeanor Brooklyn Treatment Court. Judge Gubbay ordered bail in the amount of $1,500/$1,000, and adjourned the case to December 5, 2003. Mr. Harvey did not post bail and was placed in custody of NYC DOC on Rikers Island.

23. On December 5, 2003, Mr. Harvey appeared before the Kings County Criminal Court on charges of possession of a controlled substance in the seventh degree.

24. However, because the District Attorney's Office did not have the necessary lab reports prepared, the criminal court judge adjourned to January 13, 2004 and ordered the Department of Correction to release Mr. Harvey on his own recognizance.

25. On information and belief, Immigration and Customs Enforcement (ICE) had lodged a detainer on Mr. Harvey.

26. On information and belief, when ICE issues a detainer, it sends a notice to the Warden of the facility advising that ICE has initiated an investigation to determine whether the immigrant is subject to deportation. The notice requires the Warden to detain the immigrant for a period not to exceed 48 hours to provide adequate time for ICE to assume custody.

27. Mr. Harvey had a deportation order based on past offenses that he was in the process of appealing.

28. Mr. Harvey was not given a copy of the detainer or otherwise informed of its existence.

29. Pursuant to the immigration detainer, NYC DOC had the authority to detain Mr. Harvey for no more than 48 hours, not including Saturday and Sunday, after the court ordered his release.

30. On information and belief, NYC DOC and its employees knew or should have known that they had no legal authority to detain someone under an immigration detainer beyond this 48-hour limit and no authority to detain a deportable immigrant who has been ordered released by the criminal court in the absence of such a detainer.

31. On information and belief, the 48-hour limit on detention is clearly stated in immigration detainers sent to Wardens by ICE.

32. The 48-hour limit is also clearly stated in 8 CFR 287.7(d)(3), the federal regulation that provides authority for immigration detainers.

33. The criminal court judge ordered Mr. Harvey released on his own recognizance on Friday, December 5, 2003.

34. Thus, under the terms of the detainer, Rikers had authority to detain Mr. Harvey for an additional 96-hour period, including Saturday, Sunday, Monday, and part of Tuesday.

35. ICE failed to assume custody of Mr. Harvey during this 96-hour period.

36. On Tuesday, December 9, 2003, Rikers' authority to detain Mr. Harvey under the immigration detainer expired.

37. Therefore, by Tuesday, December 9, 2003, NYC DOC was obligated to release Mr. Harvey on his own recognizance, as ordered by the criminal court judge.

38. Instead, NYC DOC continued to detain Mr. Harvey at Rikers. Mr. Harvey was held without authorization for a total of 35 days after he acquired a right to be released, from December 9, 2003, to January 13, 2004.

39. On information and belief, the City of New York has a policy of holding immigrants under ICE detainers until ICE is ready and willing to assume custody of them.

40. On information and belief, pursuant to this policy, NYC DOC frequently detains immigrants beyond the 48 hours authorized by 8 CFR 287.7(d)(3).

41. Mr. Harvey met other victims of this practice during the months he spent in ICE detention in 2007.

42. On information and belief, NYC DOC officials with final decision-making authority acquiesced in the decision to hold Mr. Harvey, with deliberate indifference toward the resulting clear violation of his constitutional rights.

43. On information and belief, New York City has also failed to adequately train and supervise corrections staff on procedures for releasing inmates after detention authority under an immigration detainer expires, amounting to deliberate indifference to an obvious need for such training.

44. On information and belief, NYC DOC knew its employees were likely to confront situations in which immigrants held under immigration detainers are not picked up by ICE within the 48-hour time limit.

45. On information and belief, New York City's failure to adequately train and supervise deputy wardens, captains, and corrections officers on the proper handling of immigration detainers has resulted in the unlawful and unconstitutional detention of not only Mr. Harvey, but also many other immigrant inmates.

46. Between December 9, 2003, and January 13, 2004, Mr. Harvey was detained at the North Infirmary Command West Facility (NIC-WF) and George Motchan Detention Center (GMDC) facilities on Rikers Island.

47. Mr. Harvey was transferred to NIC-WF from the Otis Bantum Correctional Center (OBBC) on December 6, 2003, and from NIC-WF to GMDC on January 8, 2004.

48. On information and belief, Mr. Harvey's movement records clearly stated that he had been ordered released on December 5, 2003.

49. On information and belief, the deputy wardens, captains, and corrections officers at NIC-WF and GMDC failed to take any steps to secure Mr. Harvey's release after December 9, 2003, when the City's legal authority to detain him expired.

**III. New York City Prevented Plaintiff from Attending His Court Date on January 13, 2004**

50. At about 11 p.m. on the night of January 12, 2004, NYC DOC staff informed Mr. Harvey that he would be going to Brooklyn Criminal Court the next day.

51. Mr. Harvey's corrections file clearly indicated that his court date had been adjourned on December 5, 2003, and that he was required to appear in court on January 13, 2004.

52. However, when Mr. Harvey went to the receiving room on the morning of January 13, 2004, he was told that he would not be going to court.

53. Instead, the corrections officer informed him that he was being transferred to ICE.

54. Mr. Harvey protested that he could not be transferred to immigration because he was required to appear in court, and he asked the corrections officer to confirm that his instructions were correct.

55. The corrections officer checked and confirmed that he would be going to ICE, not to court.

56. Mr. Harvey was moved to a different receiving room and placed in a holding cell.

57. On the morning of January 13, 2004, Mr. Harvey was discharged from NYC DOC custody and transferred to ICE custody.

58. By transferring Mr. Harvey to ICE on the very day of his scheduled court appearance, NYC DOC prevented Mr. Harvey from appearing in court.

59. On information and belief, NYC DOC officials with final decision-making authority either participated or acquiesced in the decision to transfer Mr. Harvey on the day of his court date, in clear violation of his constitutional rights.

60. On information and belief, NYC DOC has also failed to adequately train and supervise corrections staff on procedures for transferring immigrants with pending court dates to ICE, amounting to deliberate indifference to an obvious need for such training.

61. On information and belief, NYC DOC failed to inform the court that Mr. Harvey had been transferred to ICE custody and would not be produced for his scheduled court date.

62. When Mr. Harvey failed to appear, the court issued a bench warrant for his arrest.

**IV. New York City's Unlawful Actions and Policies Deprived Plaintiff of Liberty for More Than 100 Additional Days, from September 2 to late December**

63. Mr. Harvey was detained in ICE custody from January 13, 2004, until March 16, 2006, when he was granted supervised release.

64. After his release, Mr. Harvey began to reconstruct the pieces of his life that had been torn apart by years of detention.

65. Mr. Harvey was reunited with his family and was finally able to spend time with his three young grandsons.

66. In particular, he formed a special bond with his youngest grandson, who grew so attached to his grandfather that he preferred to sleep by his side, rather than in his crib.

10

67. Mr. Harvey's wife, Wendy Harvey, was finally relieved of the long bus trips she took every weekend to visit her husband in ICE detention facilities in New Jersey, and she was finally able to live a normal life with her husband and family.

68. Mr. Harvey obtained a loan to start up a small business. He also secured a student loan and enrolled in a course of paralegal studies.

69. During this time, Mr. Harvey continued to pursue his immigration case.

70. Mr. Harvey had appealed his order of deportation pro se to the Second Circuit Court of Appeals, and although he had strong arguments in his favor, Mr. Harvey also knew that, should the Second Circuit affirm his order of deportation, these months at liberty might be his last chance to spend extended time with his wife, children, and grandchildren, who are all American citizens.

71. Then, on September 2, 2006, Mr. Harvey was arrested by the New York City Police Department pursuant to the bench warrant issued in 2004.

72. The reason for Mr. Harvey's arrest was NYC DOC's decision to transfer him to ICE on his scheduled court date in 2004 and its prior decision to unlawfully imprison him beyond the 48 hours authorized under the terms of the ICE detainer.

73. Only upon his arrest, over two-and-a-half years after NYC DOC prevented him from appearing in Kings County Criminal Court, did Mr. Harvey learn that a bench warrant had been issued and understand that his criminal case had not be closed when he was transferred from Rikers to ICE in 2004.

74. Mr. Harvey was remanded to Rikers and once again separated from his family and deprived of his liberty.

75. Once in Rikers, Mr. Harvey proceeded immediately to challenge his detention pro se.

11

76. Having discovered that his criminal case had not been closed upon his transfer to ICE, and that his transfer to ICE on that date had resulted in his current arrest, Mr. Harvey filed a notice of claim alleging that NYC DOC violated his rights by preventing him from appearing in court to answer the charges lodged against him.

77. Mr. Harvey also moved to dismiss his criminal charges on speedy trial grounds.

78. Judge McGuire presided over Mr. Harvey's criminal case in Kings County Criminal Court.

79. Judge McGuire found that NYC DOC had custody of Mr. Harvey until he was discharged to federal authorities on January 13, 2004.

80. Because NYC DOC is a city agency, Judge McGuire attributed NYC DOC's knowledge of Mr. Harvey's whereabouts to the District Attorney's Office and found, further, that the District Attorney's office had failed to make reasonable efforts to obtain Mr. Harvey's presence.

81. On December 12, 2006, Judge William McGuire dismissed the charges against Mr. Harvey on speedy trial grounds.

82. Mr. Harvey's detention from September 2 until late December, was the direct result of the NYC DOC's unlawful actions in both detaining Mr. Harvey beyond the 48-hour limit on the immigration detainer and preventing him from appearing in court on January 13, 2004.

**V. New York City's Unlawful Actions Resulted in Serious Immigration Consequences**

83. Mr. Harvey's detention in the fall of 2006 had serious consequences for his immigration case.

12

84. Mr. Harvey's detention in Rikers caused ICE to lodge another immigration detainer against him on October 2, 2006, despite the fact that Mr. Harvey had already been released from his detention pursuant to the immigration detainer issued in 2003 and faced no new criminal charges in 2006.

85. Had Mr. Harvey not been detained at Rikers pursuant to the 2004 bench warrant, he would not have been subject to additional immigration detention and would have remained at liberty, with his family, pending the resolution of his immigration case.

86. On information and belief, not only was Mr. Harvey subject to another immigration detainer and consequent immigration detention, but NYC DOC yet again held Mr. Harvey in excess of 48 hours on this detainer.

87. Judge McGuire dismissed the charges against Mr. Harvey on Tuesday, December 12, 2006.

88. The detainer issued by ICE gave NYC DOC authority to detain Mr. Harvey for an additional 48 hours, until Thursday, December 14, 2006.

89. On information and belief, NYC DOC did not relinquish custody of Mr. Harvey to ICE until late December 2006.

90. On information and belief, NYC DOC *again* violated 8 CFR 287.7(d)(3) and Mr. Harvey's constitutional rights by holding him in excess of 48 hours under an immigration detainer after the court had ordered him released.

91. Upon release from Rikers, Mr. Harvey was transferred to ICE custody and spent the remainder of his time in the United States in immigration detention in Alabama, far from his home and family.

92. While in ICE detention in Alabama, Mr. Harvey discovered that NYC DOC had held other immigrants in excess of the 48-hour legal limit on ICE detainers.

93. Mr. Harvey's detention in the fall of 2006 also caused ICE to label him a flight risk.

94. ICE had released Mr. Harvey from immigration detention in March 2006, but required him to report periodically to a supervision officer at the ICE offices at 26 Federal Plaza in New York City.

95. Because he was detained at Rikers following his arrest on the bench warrant, Mr. Harvey was unable to report for his supervision appointment.

96. On information and belief, as a result, ICE deemed Mr. Harvey a flight risk, a factor which contributed to his prolonged detention in Alabama.

97. Finally, Mr. Harvey's detention in Rikers prevented him from giving his oral argument before the Second Circuit in his immigration case.

98. In his Second Circuit brief, Mr. Harvey made sophisticated legal arguments, but, being a pro se petitioner, he lacked the legal education that would have helped him make his arguments with sufficient clarity.

99. Had Mr. Harvey been able to attend oral argument, he would have had a chance to explain his reasoning in person and clarify the issues raised in his brief.

100. Instead, he lost the opportunity to make his case in person, and the Second Circuit summarily dismissed his appeal.

101. As a result, Mr. Harvey was deported to Barbados in October 2007.

**VI. The Unlawful Actions of NYC DOC Caused Plaintiff Physical and Economic Injuries and Loss of Time with His Family**

102. Mr. Harvey suffers from a cervical spine condition.

103. During the time after he was released from ICE custody in March 2006 and prior to his arrest on the bench warrant in December 2006, Mr. Harvey began receiving private medical treatment for this condition.

104. Because Mr. Harvey's cervical spine condition is inoperable, he must receive ongoing care to prevent irreversible deterioration.

105. The private medical treatment Mr. Harvey received prior to September 2, 2006, was successful in alleviating the condition and preventing deterioration.

106. Mr. Harvey's unlawful detention interrupted this ongoing treatment, resulting in excruciating pain and deterioration of his condition.

107. After his release from ICE detention in March 2006, Mr. Harvey obtained a loan to start a small business and successfully attracted clients.

108. Mr. Harvey's detention in Rikers caused him to abandon his clients, resulting in the loss of his business and forcing him to default on the loans he had taken out to start the business.

109. After his release from ICE custody, Mr. Harvey enrolled a course of studies for a Bachelor of Science in Paralegal Studies, for which he obtained a student loan.

110. Under the terms of this loan, it would become due when Mr. Harvey's enrollment ended.

111. Because he was unable to participate in his paralegal courses while at Rikers, Mr. Harvey was forced to abandon his studies.

112. As a result, Mr. Harvey's student loan became due and is now in default.

113. Mr. Harvey also lost valuable time that could have been spent with his family and suffered emotional pain from his continued separation from his wife, children, and grandchildren.

114. Defendants' actions in unlawfully detaining Mr. Harvey and interfering with his right of access to the courts were the actual and proximate cause of the foregoing physical injury, economic losses, deprivation of valuable time with his family, and emotional pain and suffering.

### FIRST CLAIM FOR RELIEF
### UNCONSTITUTIONAL DEPRIVATION OF LIBERTY

115. In committing the acts complained of herein, Defendants acted under color of state law to deprive Plaintiff of liberty in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

116. As a direct and proximate result of the violation of constitutional rights by the Defendants, Plaintiff suffered general and special damages as alleged in this Complaint and is entitled to relief under 42 U.S.C §1983.

### SECOND CLAIM FOR RELIEF
### DEPRIVATION OF RIGHT OF ACCESS TO THE COURTS

117. In committing the acts complained of herein, Defendants acted under color of state law to deprive Plaintiff of his constitutionally protected right of access to the courts in violation of the First, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

118. As a direct and proximate result of the violation of constitutional rights by the Defendants, Plaintiff suffered general and special damages as alleged in this Complaint and is entitled to relief under 42 U.S.C §1983.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF FEDERAL REGULATION 8 CFR 287.7(d)

119. In committing the acts complained of herein, Defendants, acting under color of state law, violated the terms of detention under immigration detainers as set forth in 8 CFR 287.7(d).

120. As a direct and proximate result of the violation of federal law by the Defendants, Plaintiff suffered general and special damages as alleged in this Complaint and is entitled to relief under 42 U.S.C §1983.

## JURY DEMAND

Mr. Harvey demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief as follows:

a) A declaration that Defendants' actions violated the Constitution and 8 CFR 287.7(d).

b) A declaration that Defendants' actions, practices, customs, and policies, regarding the detention and release conditions of prisoners with ICE detainers, alleged herein were unjustified, illegal and violated the constitutional and legal rights of Cecil Harvey;

c) For special damages in an amount to be proven at trial including, but not limited to, loss of income, medical expenses resulting from interrupted treatment, wasted tuition payments, and loan defaults proximately caused by Plaintiff's unlawful detention;

d) For general damages as will be proven at trial including, but not limited to, physical injury, emotional suffering, and deprivation of liberty;

e) Costs and reasonable attorney fees;

f) Such other relief as the Court deems just and equitable.

Dated: October 30, 2008
New York, New York

        Respectfully submitted,

        S/_____
        WASHINGTON SQUARE LEGAL SERVICES, INC.
        Alisa Wellek, Legal Intern
        Laura Trice, Legal Intern
        Nancy Morawetz (NM1193)
        245 Sullivan Street, 5th Floor
        New York, NY 10012
        (212) 998-6430

        Attorneys for Plaintiff Cecil Harvey